ROANE, Judge.
This is a hill brought by JR. Pleasants the heir and executor of John Pleasants deceased, claiming title on behalf of the negroes, who were the property of the said Pleasants, at the time of his death, and their descendants.
This claim is founded upon the will of the said John Pleasants, dated the 11th of August, 1771; and which has this general clause, “ My further desire is respecting my poor slaves, all of them as I shall die possessed with, shall be free if they chuse it, when they arrive to 30 years of age, and the laws of the land will admit them to be free, without their being transported out of the country, I say all my slaves now born, or hereafter to be born, whilst their mothers are in the service of me or my heirs, to be free at the age of 30 years as above mentioned, to be adjudged of by my trustees their age.”
He then gives his son Robert the plaintiff, eight negroes, “ On condition he allows them to be free at the age of 30 years, if the laws of the land will admit of it.” And then, devises the residue of the slaves to various persons, under conditions similar to that last mentioned, in the devise to his son Robert.
The will of Jonathan Pleasants (who was a legatee under the will of John Pleasants of one third of his negroes on the same condition) dated the 5th of May, 1776, has a general clause respecting the freedom of his negroes, as also particular conditions annexed to each bequest, in substance similar to those before stated, to be contained in the will of John.
As, however, it does not appear, as well as I recollect, that Jonathan Pleasants had any slaves, other than those derived from his father, as aforesaid, and entitled to the benefit of his will, the will of Jonathan may be thrown out of the present case. But, if it were otherwise, I do not think it would make any material alteration in any estate, or in the decision, which I think ought now to be given.
After a demurrer by some of the defendants, for that the bill contained no matter of equity, but that the matter of it was proper for the cognizance of a Court of Law, and answers, (which it is not now necessary to specify particularly,) the Chancellor, on a hearing, over-ruled the demurrer, and decreed in favor of the plaintiffs; directing an account, also, to be taken of their profits. It is here to be remarked, that the cause with respect to the answers. *283 does not appear to have been matured and regularly set for hearing; but as all parties were willing to try it, upon the general question, which most probably did not, at all, depend upon the particular answers, and more especially, one which, involving liberty, did not admit of delay, and cannot be drawn into precedent, as applicable, on the point, to other eases, the decision given in that case, as upon the general question, was not premature; and the decision, under the restrictions now contemplated as to subordinate questions, can produce no injury to any of the parties.
In considering the general question, growing out of the will of Robert,Pleasants, as before stated, I will first con-'sider slaves as a species of property recognized and guaranteed by the laws of this country, and to be considered, with respect to a limitation over, by the act of 1727, [c. 9, 4 Stat. Larg. 223,] on the same footing with other chattels.
I will also consider, in the first place, the claim of the appellees to their freedom, only, as that of ordinary remainder-men, claiming property in them, and endeavor to test it by the rules of the common law, relative to ordinary cases of limitations of personal chattels. And if their claim will be sustained on this foundation, and by analogy to ordinary remainders of chattels, every argument will hold, with increased force, when the case is considered in its true point of view, as one, which involves human liberty.
The doctrines of the common law, relative to perpetuities as to estates of inheritance, hold a fortiori as to terms, for years and personal chattels. If it be contrary to the policy of that law, to render unalienable, for a long space of time, real estates of inheritance, on reasons of public inconvenience and injury to trade and commerce, these reasons apply, with much more force, as to interests of short duration in lands and personal chattels; not only, because the latter are better adapted to the purposes of trade than the former, but also, because of their transitory and perishable nature.
This observation goes to fortify what is so fully established by the books, as to render citation unnecessary; namely, that the policy and reason of the law leans, at least, as strong against perpetuities in personal as in real estates.
The utmost limits allowed by law for the vesting of an executory devise (or as Fearne has it, as applicable to per *284 sonal chattels, an executory bequest,) is the term of a life or lives, in being, and twenty-one years after. This limitation, then, has become a fixed canon of property, and ought not to be lightly departed from: And the true distinction is, where the event must happen, if at all, within those limits, the executory devise is good; and on the happening of the contingency, the estate will become absolute, in the remainder-man.
' Thus, a limitation to one, in esse, in fee or in tail, after a dying without issue, is not good, because the contingency, the dying without issue, is too remote. But such a limitation to one, in esse, for life, is good; because the contingency must happen, if at all, so as to vest the estate, within a life in being, viz. that of the remainder-man; that is to say, the limitation in remainder for life restrains the previous disposition, in the same manner, as if it had been expressly limited to the remainder-man, on the event of dying without issue, in his life-time.
This case seems directly parallel with the case before us, the happening of the contingency here; i. e. the passing a law to authorise emancipation, standing simply, is too remote, as it may not happen within 1,000 years: But, when the testator goes on further, and means the benefit of it to persons in esse, (for they are the objects of his bounty, and unless it happened within their lives, it might as well, as to them, not happen at all,) this restrains the happening of the contingency, as in the case before put; and makes the executory devise good, at least as to all, who are within the legal limits.
Nay, the doctrine is carried so far, as to terms for years, personal estates, (for it is otherwise with regard to estates of inheritance, in favour of the heir,) that Courts are inclined to lay hold of any words, in the will, to restrain the general words, “leaving issue,” to mean leaving issue at his death; and thus to support the remainder. As, in the case of Keily v. Fowler, Fearne on Rem. 369, where those words were so restrained, in a case where the estate was to return back to the executors, in the event of dying zoithout leaving issue, and tó be distributed by them, and 50/. were given them for their personal trouble. Here the words were so restrained, in order to reconcile the limitation to the devisee, with the nature of the trust reposed in the executors, and to be executed by 'themselves, in their lives„
*285 The construction, in this case, must be, as it would have been at the instant of the testator’s death. Doe v. Fonnereau, [Dougl. 487.] And, (the event put out of the question, at present, and leaving, for an after-consideration, the circumstances of the contingency having actually happened, and its effects upon the case,) as upon the will itself, the estate, limited on the contingency, (if I may so express it,) that is to say, the right of freedom was good, if the contingency happened within the legal limits, in favor of such as might be in esse to enjoy it, and void, if it happened beyond those limits.
This bx-ings us to the consideration, whether the limitation can be sustained, as on the construction of the will itself, as to such as might be in esse during such limits, although it may be void as to such as might be born in a remote generation ?
And I have no doubt but it may.
I have no doubt, but that the limitation, as upon the will itself, may be construed distributively, so as to be efficacious as to some of the plaintiffs, although it might be void as to future claimants; that is to say, such as claim beyond the legal limits, in the event of the contingency’s happening sooner or later, as the case may be. In the case of Forth v. Chapman, 1 P. Wms 663, there was a limitation of freehold and lease-hold lands in the same manner, to wit: {eIf the first devisee die, without issue.” These last words, die without issue, were construed, under the distinction before taken, to be tied up to mean issue living at the death, as to the lease-hold land, and consequently the limitation was held good; but, as to the freehold lands, they were not considered as being so restrained, and they received the same construction by the Ld. Chancellor as if they had been twice repeated.
To come now to the case before us, as it really is. The contingency has happened within the limits. The effect is, that the limitation over has thenceforth become vested, in interest, in all the appellees, then in esse; and vested in possession, as to all, then, or as they might become thirty years of age. As to all the slaves, then in esse, but under thirty years of age, their right to freedom was complete, but they were postponed as to the time of enjoyment. They were in the case of persons bound to service for a term of years, who have a general right to freedom, but there is an exception, out of it, by contract or otherwise.
*286 What then, after the passing of the act, is the condition of the children born of mothers, so postponed in the enjoyment of their freedom? Are they, at their birth, entitled to freedom? Or, are they too, to be postponed, until the age of thirty? The condition of the mothers of such children, is, that of free persons, held to service, for a term of years: such children are not the children of slaves. They never were the property of the testator or legatees, and he or they can no more restrain their right to freedom, than they can that of other persons born free. The power of the testator in this respect, has yielded to the great principle of natural law, which is also a principle of our municipal law, that the children of a free mother are themselves also free. The conditimrs of the will then, as applicable to such children, if indeed it was intended, or can be construed to apply to them, is void, as being contrary to law*; it being an attempt to detain in slavery, persons that are born free. Considering the mothers of such childi’en, by analogy to other persons held to service, it will be found, that a particular law was here necessary; the power of the Legislature alone, was competent to subject the children of mulatto mothers, held to service till the age of thirty-one, to serve till the ages respectively of twenty-one and eighteen. But this case goes further, and is an attempt, by an individual, to hold to service, till the age of thirty, persons, who, following the condition of their mothers, are born free.
The view of the subject I have now tahen, (which will sustain the claim of the plaintiff, by referring to the ordinary doctrine of limitations of personal chattels,) will supersede the necessity of a very delicate and important enquiry: namely, whether the doctrine of perpetuities is applicable to cases in which human liberty is challenged?
It is clear, that the restraints, rightly imposed on the alienation of inheritances, to prevent perpetuities, are founded principally, if not solely, on considerations of public policy and convenience: That those restraints have gradually been extended to terms for years and chattel interests, and that the utmost tolerable limits in such cases, have not been settled till after much investigation, and a considerable lapse of time. It is also clear, that neither the particular species of property now in question, nor the ca-f. of a remainder-man, (if I may so express it,) claiming his own liberty, were in the contemplation of the Judges, who established the doctrine on this subject; *287 which, therefore, may not apply. But, this is an extensive question, and if it were necessary to be now decided (but it is not,) it would be proper to weigh the policy of authorising or encouraging emancipation, (a policy, which has certainly received in many instances, and partly by the act of 1782, the countenance of the Legislature, at least from the era of our independence, and must always be dear to every friend of liberty and the human race,) against those secondary considerations of public policy and convenience; which appear to have supported and established the doctrine of the law, on the subject of perpetuities, as relative to ordinary kinds of property.
But it is said, the act of 1782, authorising emancipation, is prospective in its operation, and does not take in the present case. In answer to this, I am of opinion, that the acceptance of the negroes in question, on the condition stated in the will, created an inchoeate contract to emancipate, on the part of the devisees; which, on the passing of the act, became essentially complete: That an emancipation ought, therefore, to have been made; that the devisees were, thereafter, trustees, for the purpose of making such emancipation; and that the plaintiffs are right, in coming into a Court of Equity, to enforce the fulfilment of that trust: And this is one answer to the objection on the score of jurisdiction.
It is said too, that as the will speaks of an unqualified emancipation, (without respect to bond and security, to prevent aged and infirm slaves from being chargeable to the public,) and, as the act of 1782 has required that such security should he given, an act authorising emancipation, in the sense contemplated by the will, has not yet passed; and, therefore, the condition imposed upon the legatees, is not obligatory.
In answer to this, I am of opinion, that the testator cannot reasonably be supposed to have contemplated an act of emancipation, making no provision to prevent the persons liberated from being chargeable to the public. That, therefore, the act, as contemplated, has substantially taken place; and, that a Court of Equity may carry the contract into execution, if in no other manner, at least by throwing the burthen of the indemnity, required by the act of 1782, upon the slaves themselves, and making it a lien, upon the liberty granted them; and such an arrangement, it is evident, would place the holders in the same, and no worse condition, than if an unqualified act in favor of emancipa *288 tion had actually passed. The necessity of making such an arrangement, in this ease, shews the propriety of applying to a Court of Equity; because, no other Court has adequate power: Which is another answer to the want of jurisdiction.
In what manner the arrangement should be made, in this case, so as to comply with the act of 1782, requiring an indemnification against aged and infirm slaves; becoming -chargeable to.the public, is a subject, upon which I have had considerable difficulty. But, I am fully persuaded, that the powers of a Court of Equity, which regards the substance of things more than forms, are competent thereto ; and I now beg leave to refer to the projet of a decree, which I shall take the liberty of stating, presently, as containing the result of my deliberations on the subject.
Another ground, upon which the jurisdiction of the Court of Equity is sustainable, in the present case, is, that it involves the rights of a great number of claimants. '* So, that the joint suit prevents a great deal of litigation and expense; besides, involving, in the same common fate, those who stand on one common title. Whereas, if separate suits were brought, it might turn out, either upon general or special verdicts, that persons having the same rights, nay, even children of the same mother, might one be adjudged to be free, and another a slave. An enormity which the joint proceeding is wisely calculated to prevent.
With respect to the slaves claimed by Elizabeth Pleasants and by Teasdale, paramount to the will of J. Pleasants, my opinion, in the present case, does not extend to them, so far as the title thereto is claimed paramount to that will; but, such title ought to be considered as still open, if desired, for discussion and decision.
With respect to the debts of the original testator, if any, the original slaves and their descendants are clearly liable. But, whether they are liable to the debts of the devisees accepting them, or their right to freedom is lost by a bona fide sale, if any such has taken place, are questions which I also consider as open for the decision of the Chancellor, if required. It would seem to me, however, as at present advised, that if the limitation was good, by the rules of law, the right thereby created would not yield, either to the claim of creditors or purchasers. But, on this point, I give no decided opinion.
[Mitford’s Plead. 117, 3 laud. ed.]
*289 I have now gone through, or touched upon such points in the case as appeared to me necessary to be noticed. There is yet one part of the Chancellor’s decree, which I could have wished had not been made. I mean the referrence to a commissioner to ascertain the profits of the slaves. We have no precedents, either of the Courts of England or this country, to guide us. In the former country, indeed, no such case could occur, because slavery is not there tolerated; and, in this country, I believe no instance can be produced of profits being adjudged to a person held in slavery, on recovering his liberty. Among a thousand cases of palpable violations of freedom, no jurylias been found to award, and no Court has yet sanctioned a recovery of the profits of labour, during the time of detention. Yet, it must be admitted, that juries are often excellent Chancellors. But, this is not a palpable violation of freedom. To say the least, it is a very nice question, whether these plaintiffs be entitled to freedom or not. And, ought the Court, in such a doubtful ease, to award that, which the whole equity of the country, flowing through a thousand channels, has not yet awarded in a single instance ? It seems to be a solecism, to award ordinary profits to recompenee the privation of liberty; which, if it is to be recompenced, the power of money cannot accomplish.
But what, with me, is decisive on this point, is this, that as, in my opinion, all the children born of the female negroes in question, since the passage of the act of 1782, are, and were thenceforth entitled to freedom by birth, the burthen of rearing such persons, during their infancy (which must be borne by the legatees,) will form perhaps not an unreasonable set-off against the profits of those who were capable of gaining profit by their labor.
I have thus endeavored to make known the grounds upon which my opinion is founded. I entirely concur in the result of the Chancellor’s decree, except in the particulars, in which I have already stated my opinion to be different. As it is the policy of the country to authorise and permit emancipation, I rejoice to be an humble organ of the law in decreeing liberty to the numerous appellees now before the Court And this, upon grounds, as I suppose, of strict legal right, and not upon such grounds as, if sanctioned by the decision of this Court, might agitate and convulse the Commonwealth to its centre.
*290 The general outlines and substance of the decree, which I think should be made in this case, are as follows:
That whensoever, and as soon as the appellee Robert Pleasants, or any other responsible person or persons, shall, under the direction of the High Court of Chancery, enter into bond with sufficient securities, in such Court or Courts, under such penalty or penalties as the said High Court of Chancery shall direct, with condition to indemnify and save the public harmless, with respect to all such of the slaves in question as were in esse at the time of the passage of the act of 1782, authorising emancipation, and shall be deemed to fall within the provisions of that act, relative to old age and infirmity, with an exception, however, with respect to such indemnity, as to such of the said slaves as may be under the age of thirty, and may be deemed infirm, for the period or periods of time it may respectively require them to accomplish the said age of thirty years, and during which they will remain, at the proper charge of the legatees or holders under the will or wills in question. Or, whensoever, and as soon' as the Legislature of this Commonwealth shall, if it ever shall, remit the indemnity above supposed, necessary to be given. And when, in addition, in either case, it shall appear to the satisfaction of the said High Court of Chancery, either that there are no legal and subsisting debts of the said John Pleasants, the testator, or that being so, a sufficient fund has been raised, by the common labor of the said slaves, to discharge the said debts; which, in that event, saving the right of the legatees, as aforesaid, the said Robert Pleasants, or any other trustee to be appointed by the said Court, are authorised to do; and if it shall be found, that the testator Jonathan Pleasants possessed, at his death, any slave or slaves other than those derived under the will of the said John, and now in question, then a like provision to be extended to them, in respect of his the said Jonathan’s proper debts, if any; it shall be the duty of the said High Court of Chancery to emancipate and set free the said slaves, respectively; subject, nevertheless, to the rights of the legatees, and those claiming under them, to their labor, until they shall severally have attained the age of thirty years, in like manner, and to all intents and purposes, as if they had been respectively emancipated, conformably to the said act. But, if such indemnity be given or remitted, as the case may be, within a reasonable time, to be adjudged of by *291 the said Court, it shall, in that event, be lawful for the said Robert Pleasants, or any other trustee or trustees, to be appointed by the said Court, to possess the whole of the said slaves (subjeclas aforesaid) in trust, to raise a sufficient fund to answer or procure the said indemnity, and satisfy the debts, if any, as is aforesaid; and as soon as those purposes are accomplished, in the opinion of the said Court, it shall have power, and is hereby directed, to manumit the said slaves, subject, as is aforesaid, in the manner above directed; adopting and pursuing, in either case, such measures as are provided by the said act of 1782, as far as may be, for preserving the evidences of their title to freedom. Provided, that nothing herein contained shall be construed to extend to any of the slaves in question, bom since the passage of the act of 1783, and who are entitled to freedom, by birth, and not by emancipation. Nor to the paramount titles set up, by Elizabeth Pleasants and Daniel Teasdale, to a part of the said slaves. Nor to the question, whether the said slaves are liable to pay the debts of the original legatees, or those who claim under them ? Nor, if sold to bona fide purchasers, whether such sale be valid to bar the right of liberty now asserted ? Nor to bar or affect the title or titles of any person or persons whatever, other than the said testator or testators, as the case may be, and those claiming under them, respectively. All which questions ought to be considered, as open and undecided, as if the present decision had never been made.
CARRINGTON, Judge. I concur with the decree of the Chancellor, so far as it goes to overrule the demurrers of two of the appellants. For, it was unquestionably a proper subject for the interposition of a Court of Equity, and strictly within its jurisdiction. I am also of opinion with the Chancellor, that the plaintiff, neither as heir at law, executor, or trustee, could proceed, at law, as for a condition broken; he having parted with his powers, by his own assent and distribution of the slaves amongst the legatees.
But I differ widely from the Chancellor with respect to the exercise of his jurisdiction; Perhaps, I do not understand the principles and reasoning, upon which he founds his decree; but, the result is, clearly, contrary to both Law and Equity.
It is contrary to law, because he has not preserved the principles of the only law giving owners power to email *292 cipate: It is contrary to equity, because it either fixes on the public, a certain expense, or leaves a number of these people to starve, for want of subsistence.
Until the year 1748, every owner of a slave had a right to emancipate him, upon the principle of having a right to dispose of his own property as he pleased; but the Legislature, conceiving that inconveniences arose therefrom, passed a law to prevent the manumission of slaves, except for meritorious services, to be judged of by the Executive. Which law remained unaltered, until the year 1782, when the act passed allowing emancipation, upon condition that the public is indemnified against loss and expense. This is still the law, and ought to have been attended to by the Chancellor, in forming his decree.
I p.erceive no difficulty in ascertaining the meaning and intention of both the testators; who discover a strong desire to emancipate their slaves immediately on their deaths. But, as the then existing laws would not permit, they did all they could towards effecting it, by directing that it should be done, as soon as the laws would authorise it; and, in the mean time, making temporary devises of them amongst their children and friends, with a positive condition annexed, that the different devisees should liberate them, as soon as by law it should be allowable, on their respectively attaining to the age of thirty years: Which period was probably fixed upon, with a view to the labor of the slaves affording some compensation for the trouble and expense of taking care of the aged or infirm, and rearing the children.
The question, then, is, whether these devises are sustainable? I hold that they are, and not liable to the rule respecting chattel interests, limited on more remote contingencies, than the law allows: For, the subjects of the devises are different, inasmuch as in the devise of chattels, property only is concerned; but, liberty is devised in this case:' both sacred rights, indeed, but the rules of limitation not necessarily the same with regard to them.
In point of fact, the contingency actually happened, within a very small space of time: for, within six years from the date of Jonathan Pleasants’s will, a law was passed enabling owners to emancipate their slaves.
But, by this law, the owner, who would manumit his slaves, must give security to indemnify the public against the expense of supporting such as are aged, infirm, or infants: a provision, which the decree has not attended to. *293 although it certainly ought, not to be overlooked. But I do not think that the holders, in the present case, should be compelled to give it themselves. On the contrary, I think the emancipation should be upon the condition, that the present friend of the appellees, or some other person or persons, will procure the security required by law: which will be consistent with the conduct of the Legislature in two recent instances; namely, in the case of Mayo’s slaves, in which the executors were, by an order of the Court of Chancery, founded on the law of 1787, [c. 73, 13 Stat. Larg. 611,] for emancipating those slaves, directed to reserve funds enough for the purpose. The other case was that of Moorman’s slaves; in which case the Act of Assembly, [c. 74, 13 Stat. Larg. 613,] for emancipating of them, directs, in so many words, that the executor, or some other person, should be bound to indemnify the public.
Having mentioned my opinion upon the. general question concerning emancipation, I shall now state what I conceive to be the periods at which the appellees will he respectively entitled to their freedom, upon the conditions just explained. ' I think they are to be emancipated in the following order, that is to say; all those noiu above the age of thirty years, immediately, and the increase of mothers above the age of thirty, at the term of the birth of the child, are also to be emancipated immediately: but those born of mothers not thirty years of age at the birth of the child, are not to be liberated until they arrive at the age of thirty; and the same rules are to be observed with respect to their progeny, born during the servitude of the mothers: Which seems to me to satisfy the meaning of the testators.
The decree for profits is, I think, new and unprecedented. Besides, the account, when the reductions for the trouble and expense of taking care of the aged and infirm, and for rearing of the children, is made, would probably yield very little. Under every point of view, therefore, I am against that account, and think the decree should be corrected in that respect likewise.
Some other alterations are wanting still. For all the defendants have not been fully heard. Two demurred, and as to them the cause was properly heard. But, the cause was not in a proper situation to be heard as to Elizabeth Pleasants; and, in the case of Ned, there was no answer, nor the bill taken for confessed, after the proper pre *294 vious steps. Therefore, I think, that, as to those parties, the cause should go back to the Court of Chancery, in order, that the proper proceedings may be had therein with respect to them; so that they may have an opportunity of supporting their titles, if they can do so. ■
Besides, no attention has been paid to creditors.
Although it may not bo the case, yet it is possible, that John and Jonathan Pleasants owed debts, which are still unpaid. If there be any such creditors, their rights should be secured.
The holders of the slaves may owe debts; and it is expressly said to have been the case of Logan. Perhaps too, some of them may have been mortgaged, or sold to innocent purchasers, upon the faith of possession, and apparent ownership in the legatees. Now, although I will not say, at present, whether the debts and contracts of the legatees, ought or ought not to affect the slaves, because the case is not before me, yet the door should not be shut to enquiry, and such creditors and purchasers excluded from shewing, if they can, that they have an equitable lien.
Upon the whole, I think the decree should be reversed; and a new one entered, conformably to the opinion, which I have delivered.
PENDLETON, President. On mature consideration,. I am of opinion, that the suit in Chancery cannot be sustained upon the ground of the appellee’s claim as heir at law to take the slaves for the condition broken, it being the practice of that Court to relieve against forfeitures and not to aid or enforce them. Neither will his claim, as executor, have that effect; because, having long since assented to the several legacies and bequests of these people, he had fully executed his power over the subject. At the same time, these characters furnish a commendable reason for his stating the case of these paupers to the Court; and it ought to be heard and decided upon, without a rigid attention to strict legal forms, since it can be done, without material injury to the other pa'rties.
And upon a view of the case, I am of opinion, that the paupers are not legally emancipated under the wills of the testators and the several acts of Assembly; but if they are entitled to relief, at all, it is on the ground of a trust created by the wills, that their manumission should take place, upon a contingent event, which it is alledged has essenti *295 ally happened, but requires an act to be done by the possessors, who refuse to perform it, and a Court of Equity can, alone, enforce the execution of the trust, or make the necessary arrangements therein; and therefore, that there is no error in so much of the decree, as over-rules the demurrers of the appellants Mary Logan, Isaac Pleasants and Samuel Pleasants, jr. for want of jurisdiction.
But, as the cause was only set for hearing on the demurrers, and not on the answers and exhibits, it would seem, that, regularly, that Court could not, in that state of the proceedings, have proceeded to a hearing and decree upon the merits: Nevertheless, upon the principle before stated, of not adhering to strict form, in this pauper ease where essential justice can be done; (since the answers of these three defendants put their defence upon the wills and acts of Assembly, without alledging any facts to influence their construction, and the counsel, on both sides, have argued the merits at large,) the Court have, in this case, for convenience, without meaning to fix a precedent, considered and determined the general question; leaving however, the claims of Elizabeth Pleasants and Daniel Teasdale to part of the paupers, under titles paramount to the will of John Pleasants, and the question, how far those in the possession of Mary Logan, shall be liable to the debts of her husband, open for discussion in the Court of Chancery, upon proper statements of the facts, and exhibits relative thereto; which they are to be at liberty to introduce in that Court.
Although the testators, at the time of making their respective wills, had not power to manumit, and if they had devised them upon condition that the devisees should emancipate them immediately, the condition, being unlawful, would have been void, and the property vested; yet a condition, that they should become free when the law would permit it, was not of that sort.
To consider this freedom in the light of a limitation of the remainder of a chattel, upon a contingent event, it would seem to assimilate to the case of such remainder, limited over upon a general dying without issue, and therefore, void; since the Legislative permission might never be given; might be afforded one hundred years after; or at an earlier period. And the will in the other case, is allowed to be the rule of judgment, unaltered by the event, although the dying without issue shall happen in a reasonable time; all being involved in one fate. But I am *296 of opinion, that it would be too rigid to apply that rule, with all its consequences, to the present case; and that a reasonable principle ought to be adopted, to suit its peculiar circumstances; which is, that, if the event happens whilst the slaves remain in the possession of the family, without change by the intervention of creditors or purchasers, since the contending parties would be those whose interests had been contemplated by the testators, the bequest ought to take place; But, that the case of such intervening claims, not being in the view of the testators, it ought to be considered, how far they should in equity prevent the devise of the manumission from taking effect. So far, therefore, as concerns the family, I should have had no difficulty, in decreeing in favor of the paupers, if .the wills had directed a general emancipation, when permitted, and the Legislature had permitted it without any condition annexed to it.
The difficulty arises from the testator’s not having directed a general manumission, when permitted by law; but a limited one, directing all future generations of these people, born whilst their mothers were under thirty, to serve to that age; founded no doubt, upon a consideration of the interest of his family, and that of the slaves.
On this middle state, the Legislature have not declared their will; except in a case which assimilates to this, namely, that of mulattoes, the descendants of a free white woman by a negro; all of whom, born whilst the mother was under thirty-one years of age, were to serve to that age in all generations, by an act passed at an early period, and continued in force until 1764,* when it was repealed; which is not conclusive, as to their will, upon the present subject. On the other hand, the Legislature have permitted a voluntary unlimited emancipation, but’annexed a condition, that the person liberating shall support 'and maintain all such, as in the judgment of the Court are not of - sound mind or body, or above forty-five, or males under the age of twenty-one, and females under eighteen; to be levied upon him, or his estate, by order of the Court in case of neglect or refusal. On these terms the testators have not declared their minds, whether they would, or would not, have compelled the devisees to emancipate, subject to them.
*297 Under this difficulty, the Court endeavoured to model a decree, to effect the purpose of the paupers, without essentially violating the wills or the laws; and, was of opinion, that the limited manumission, according to the modifications in the wills of the testators, could alone take place and be decreed; and would have found no difficulty in making such a decree from the silence of the Legislature on such a state of servitude, (since it might in future act upon the subject, and either continue or discontinue it,), but, had insuperable difficulty upon the terms imposed by the law, which may be important. The person empowered to emancipate, had an opportunity of judging whether he would do the act upon that condition. In the present case, the devisees, the legal proprietors, oppose the manumission, and the question is, whether they shall be compelled, under the wills, to do the act, be subject to new hardships, not imposed on them by the wills, and on which no person can say what would have been the decision, had the testators contemplated the subject.
On Moorman’s will, an act passed in 1787, reciting his will in 1778, by which he devised certain slaves by name, to each of the different legatees to enjoy their labor; the males to twenty-one, the females to eighteen, and then all to be free; except some devised to his wife, which she was to have for life, and then they were to be free; and except another parcel, who were to be immediately free. The act divides them into four classes:
1. Those who were between twenty-one and forty-five.
2. Those devised to the mother then dead; which two classes were to be immediately free, as if born so; and their increase were also to be free.
3. All under twenty-one and eighteen were to be free when they attained those ages) and the increase of those to he free at a future period, were to be free with the parents.
4. Those above forty-five to be free when Johnson, the executor, or any other, should enter into bonds, with approved security, to the County Court, with condition that they should not become chargeable to the public. This was, in spirit, pursued by a majority of the Court; and a decree has been formed to the following effect:
c e The Court is of opinion, that there is no error in so much of the decree of the said High Court of Chancery as over-ruleth the demurrers of the appellants Mary Pleasants, Isaac Pleasants and Samuel Pleasants, junior, for want of jurisdiction in the said Court, but that there is *298 error in sonic of the principles on which the decree, upon the merits, is founded, and part of the reasoning thereup* on is not approved by this Court: Therefore, it is decreed and ordered, that so much of the said decree as over-ruleth the said demurrers, be affirmed, and that the residue of the said decree bo reversed. And this Court, proceeding to make such decree as the said High Court of Chancery should have pronounced, is of opinion, that although the testators, at the time of making their respective wills, hadK not power to manumit, and if they had devised them upon condition that the devisees should emancipate them immediately, the condition, being unlawful, would have been void, and the property vested; yet, the condition, thai they should become free when the law would permit it, was not of that sort. That to apply the rule respecting the limitation of the remainder of a chattel upon too remote a contingency, with all its consequences, to the present case, would be too rigid, but, that a reasonable principle ought to be adopted to suit its peculiar circumstances; which is this, that if the event happens whilst the slaves remain in the possession of the family, without change by the intervention of creditors or purchasers, since the contending parties would be those whose interest had been contemplated by the testators, the bequest ought to take place; but, that the case of such intervening claims not being in the view of the testators, it ought to be considered how far they should, in equity, prevent the devise of the manumission from taking effect. So far, therefore, as concerns the family, the Court would have had no difficulty in decreeing in favor of the paupers, if the wills had directed a general emancipation, when permitted by law, and the Legislature had permitted it, without any condition annexed; but, a difficulty arises from the testator’s not having directed a general manumission, when allowed by law, but a limited one, directing that all future generations of these people, born whilst their mothers were under thirty, should serve to that age: founded, no doubt, upon considerations of the interest of his family, and that of the slaves: on which middle state the Legislature have not declared their will; and, on the other hand, the Legislature have permitted an unlimited emancipation, but annexed a condition imposing upon the person liberating, certain terms for the sake of the community, of which the persons making voluntary manumissions might judge whether they would do the act upon these terns, and use their pleasure, and on these *299 terms the testators have not declared their minds, whether they would or would not have compelled the devisees, against their inclination, to emancipate subject to them. Under this difficulty, the Court endeavored to model a decree, to effeci the purpose of the paupers, without essentially violating the wills; and is of opinion, that the limited manumission, according to the modifications in the wills of the testators, can alone, take place and be decreed, and that the terms for securing the public against the maintenance of the aged or infirm, cannot be equitably imposed upon the devisees. It is, therefore, further decreed and ordered, that all the slaves of which the testators were possessed, as their property, at the time of their respective deaths, not subjected to the claims of the creditors or purchasers before stated, and who are now above the age of forty-five years, and their increase born after their respective mothers had attained the age of thirty years, (so soon as Robert Pleasants, the executor, the several trustees, or any other person, shall, in the Courts of the several counties in which the said slaves respectively reside, enter into bonds, with approved sureties, payable to the Justices then sitting in each Court, and their successors, with condition that'the said slaves shall not become chargeable to the public, or enter into one such bond for the whole, in the General Court,) and all such as are now above thirty, and under the age of forty-five years, immediately shall be emancipated and set free, to all intents and purposes, in like manner as if they had been bom free, and that all who are now under the age of thirty, and whose mothers had not attained that age at their birth; and all their future descendants, born whilst their mothers are in such service, do serve their several owners until they shall respectively attain the age of thirty years, and then be in like manner free; and when their freedom shall severally take effect according to this decree, there shall be delivered to each of them, by their respective masters or mistresses, a certificate, written or printed, attesting their freedom, in snch form as shall be directed by the said High Court of Chancery. That no account ought to be taken of profits, it being unusual in such cases, and less reasonable in this very difficult one. And the cause is remanded to the said High Court of Chancery for a state to be taken of the present condition of the several persons, and their rights ascertained, according to the principles of this decree; also, for further proceedings to be had, respecting the claims of Elizabeth Pleasants *300 Daniel Teasdale, to part of the slaves, under titles paramount to the will of John Pleasants, and the claim of the creditors of Charles Logan, upon proper statements of the facts and exhibits relative thereto; which they are to be at liberty to introduce in the said Court.” *

[* See acts of April, 1691, Oct. 16, 3 Stat Larg. 87, and of May, 1723, c. 4, § 22, 4 Stat. Larg. 133; of Nov. 1753, c. 7, § 4, 6 Stat. Larg. 357; Oct. 1765, c. 24, § 3, 8 Stat. Larg. 134.]

[* See Maria et al, v. Surbaugh, 2 Rand. 228-246; in which, this case is remarked on, and the subject elaborately considered by Greek, J. The point decided was, that where a testator bequeaths a female slave, on condition that she shall be free at a certain age, and before that period arrives, she has issue, such issue are slaves.]